[Sac. No. 6190.   In Bank.   Feb. 17, 1953.]

SUTTER BASIN CORPORATION, LTD. (a Corporation), Petitioner, v. HANLON BROWN, as County Treasurer, etc., et al., Respondents.

Wright & Garrett, Alfred Wright and David M. Harney for Petitioner.

Loyd E. Hewitt, District Attorney (Sutter), Bruce F. Allen, Stephen W. Downey and Downey, Brand, Seymour & Rohwer for Respondents.

EDMONDS, J.—The Treasurer of Sutter County has made a call upon the owners of lands in Reclamation District No. 1500 for the payment of certain sums estimated in accordance with section 3480 of the Political Code,[1] as amended in 1949. His estimate includes the amounts of the installments of interest and of principal due January 1, 1950, upon a series of refunding bonds issued in 1930. The amendment of 1949 excludes from the estimate to be made by a county treasurer all amounts in a district's bond fund which were derived from the rentals or sales of lands sold to him to satisfy delinquencies in payment of calls. By writ of mandate, Sutter Basin Corporation, a landowner in the district, seeks to compel the treasurer to cancel his present call, and to estimate the funds available for payment of the bonds in the manner directed by section 3480 as it read when the bonds were issued. The question for decision is whether the 1949 legislation applies to bonds issued prior to its effective date.

The facts have been presented by stipulation.

Reclamation District No. 1500 lies wholly within Sutter County. In 1919, Assessment No. 1, apportioned among the landowners in accordance with "special benefits" (Pol. Code, § 3456),[2] was levied by the district upon all the lands within its boundaries. One year later, bonds were issued in the approximate amount unpaid upon the assessment. In 1930, these bonds were in default and refunding bonds were issued as provided by section 3480a of the Political Code.[3] The new obligations, maturing serially between 1941 and 1962, were in the principal amount of about $4,750,000.

Except for the amendment of 1949, since 1930 there has been no change in the statutory provisions governing the payment of bonds of reclamation districts insofar as the rights

---

[1] In 1951, the Legislature reenacted the provisions of the Political Code governing reclamation districts as division 15 of the Water Code. (Stats. 1951, ch. 336, pp. 690-769.) The requirements of former section 3480 of the Political Code, insofar as they apply to the present proceeding, are now found in sections 51420 to 51425 of the Water Code.

[2] Now Wat. Code, §§ 51231, 51236.

[3] Now Wat. Code, §§ 52500-52602.

of the parties in the present proceeding are concerned. Such bonds are payable from a bond fund, of which the treasurer of the "main county in which the district is located" is the trustee. To the extent that the bond fund is insufficient to pay installments due upon the bonds, the treasurer is directed to make a call upon each landowner in proportion to the amount of his unpaid assessment. (Pol. Code, § 3480.)[4] If a property owner becomes delinquent in the payment of a call, his land must be sold at public auction and the proceeds deposited in the bond fund. (Pol. Code, § 3480.)[5] An upset price is fixed equal to the sum of the delinquency, plus a penalty and interest. If, at public auction, no bid equal to that sum is received, the treasurer, as trustee of the bond fund, is required to bid the amount of the upset price and the land is sold to him.

Prior to 1931, the treasurer could not resell such lands at less than the upset price. Due to the then existing depression in economic conditions, the upset price generally was more than the value of the land. For that reason, large areas of land sold to the treasurer to satisfy delinquencies could not be disposed of by him. To permit their restoration to private ownership, section 3466a of the Political Code,[6] enacted in that year, authorized the sale of such lands at their fair market value, regardless of the statutory upset price. It also permitted the lands to be rented, the proceeds to be deposited in the bond fund. Despite the new provision, the lands to which the treasurer of Reclamation District No. 1500 held title remained unsold, placing added burdens on the remaining landowners of the district. No taxes were paid on delinquent lands, and calls to satisfy installments due upon the bonds were not met.

In 1949, section 3466a was amended to make mandatory the sale of such lands within prescribed time limits. (Stats. 1949, ch. 719.)[7] The treasurer sold all of the lands in Reclamation District No. 1500 upon which there were delinquent assessments and deposited the proceeds in the bond fund. Including the proceeds from such sales and from crop rentals, there is now $710,000 in that fund, and a resolution would be sufficient to transfer to it $160,000 which the district has

---

[4]Wat. Code, §§ 51420-51425.

[5]Wat. Code, §§ 51630-51651.

[6]Wat. Code, §§ 51680-51695, 51750-51757.

[7]See Wat. Code, § 51680.

in its general fund. The outstanding bonds are in the principal sum of $559,500. Interest computed to maturity amounts to $263,745. If and when the cash in the general fund is transferred, there would be in the bond fund more than enough money to pay principal and interest of the bonds in full.

By the same statute, however, section 3480 of the Political Code[8] was amended to read in part as follows:

"At least ninety days before any interest day of the bonds, including refunding bonds, the county treasurer of the main county shall estimate the amount of money necessary to pay interest and principal maturing on such interest date after crediting thereon the funds in the treasury applicable to the payment thereof, *excluding therefrom any funds in the treasury deposited therein pursuant to Section 3466a of this code or derived from the sale of lands by the county treasurer as trustee of the district under the provisions of this section or Sections 3466a and 3480a of this code and the expenses of the county treasurer hereinafter provided* and shall add thereto 15 per cent of such aggregate to cover possible delinquencies. . . ." (Emphasis added to the amended portion.)

The treasurer estimated that on January 1, 1950, $16,785 would be due on account of interest and $8,000 on the principal of the outstanding bonds. Acting under the 1949 amendment, he issued a call for $24,895, plus the statutory amount to cover possible delinquencies, to owners of land subject to the 1919 assessment. Sutter Basin Corporation was notified that it must pay, as its share of the call, $13,757.

The position of the petitioner in justification of the present proceeding is that a retroactive application of the 1949 amendment, so as to exclude from the bond fund the proceeds from the resale of delinquent lands and crop rentals, will impair the obligation of the contract existing between the bondholders and the landowners of the district. So applied, it is argued, the amendment will change the time and method of payment and give the bondholders additional security.

The treasurer replies that the power of the Legislature over reclamation districts is plenary, and cannot be circumscribed. Furthermore, the amendment provides no benefit to the bondholders, and, without such benefit, there can be no impairment of contract. The funds derived from sales and rentals of delinquent lands result from section 3466a[9] of the

---

[8] Now Wat. Code, § 51420.

[9] Now Wat. Code, §§ 51680-51695, 51750-51757.

Political Code, which was enacted subsequent to the refunding bond issue. Nor is there a detriment to the landowners, for the amendment merely enforces their duty to pay their assessments, which has always existed. To hold otherwise would violate numerous provisions of the state and federal Constitutions.

Another contention of the treasurer is that issuance of a writ of mandate would be inequitable. Finally, he asserts, Sutter Basin Corporation has consented to and acquiesced in the amendment by advocating the adoption of the 1949 statute in appearances before both houses of the Legislature, and, therefore, it has waived its right to object to the amendment.

It cannot be questioned that, upon issuance of the bonds, a contract was created between the property owners and the bondholders. (*Islais Co.* v. *Matheson,* 3 Cal.2d 657, 662 [45 P.2d 326] ; *County of Los Angeles* v. *Rockhold,* 3 Cal.2d 192, 200 [44 P.2d 340, 100 A.L.R. 149] ; *County of San Diego* v. *Childs,* 217 Cal. 109, 120 [17 P.2d 734] ; *Copeland* v. *Raub,* 36 Cal.App.2d 441, 447 [97 P.2d 859] ; *River Farms Co.* v. *Gibson,* 4 Cal.App.2d 731, 749 [42 P.2d 95] ; *Hershey* v. *Cole,* 130 Cal.App. 683, 695 [20 P.2d 972].) The laws in existence at that time, under the authority of which the bonds were issued, ". . . enter into and become a part of the contract to such extent that the obligation of the contract cannot thereafter be impaired or fulfillment of the bond obligation hampered or obstructed by a change in such laws." (*County of San Bernardino* v. *Way,* 18 Cal.2d 647, 661 [117 P.2d 354].)

The treasurer's contention that legislation in regard to reclamation districts is within the plenary power of the state, and cannot be challenged by a landowner of the district, is answered in *Hershey* v. *Cole,* 130 Cal.App. 683 [20 P.2d 972]. The court said: "The supervision, the regulation and the controlling of the conduct of the affairs of irrigation, reclamation and drainage districts is plenary as to all governmental affairs, including procedure and administration, limited only where it tends to impair the obligation of a contract. In other words, the plenary power does not extend to and include the right of the legislature to trench upon private rights arising out of or based upon contracts." (P. 687.)

The time and method of payment, as well as the nature of the security given the bondholders, are integral parts of the landowner-bondholder contract. (*Shouse* v. *Quinley,* 3 Cal.2d 357, 361 [45 P.2d 701] ; *County of Los Angeles* v. *Rockhold,* 3 Cal.2d 192, 210 [44 P.2d 340, 100 A.L.R. 149] ; *Security*

*Trust & Sav. Bank* v. *City of Los Angeles,* 120 Cal.App. 518, 524 [7 P.2d 1061].) Sutter Basin Corporation contends that the 1949 amendment impairs each of these aspects of its contract.

As section 3480 of the Political Code read in 1930, when the refunding bonds were issued, the bond fund was to consist of all amounts collected by the treasurer upon assessment calls, and also from either the sale of delinquent lands or their redemption, as well as the proceeds of the resale of lands purchased by him at sales to satisfy delinquent calls. Such funds were to be used exclusively for the payment of principal and interest on outstanding bonds. Each year the treasurer was required to estimate the amount of money necessary to pay maturing interest and principal, ''crediting thereon the funds in the treasury applicable to the payment thereof'' and thereafter to issue a call to the owners of lands subject to the assessment for the balance, adding thereto 15 per cent to cover possible delinquencies. The obligation of each landowner was to pay the portion of the balance represented by his unpaid assessment, plus an additional amount to cover possible delinquencies.

According to the 1949 amendment, the treasurer must exclude from his estimate a portion of the moneys in the bond fund formerly available for bond payments. Necessarily, if the statute is to be applied as construed by him, an additional burden of payment is placed upon the landowners. Moreover, the time at which the landowner must make payment is accelerated. If the amounts sought to be excluded by the 1949 amendment may be used to pay the current installment due upon the bonds, there is no necessity for landowners to pay the present call. The amendment also changes the order of payment. By its terms, the treasurer must collect calls from landowners before certain money in the bond fund may be used. Formerly, he was to call upon all such funds first. These changes, if applied to bonds issued prior to the effective date of the amendment, are impairments of the contract of the landowners contrary to constitutional guarantees. (*Cf. Shouse* v. *Quinley,* 3 Cal.2d 357, 360-361 [45 P.2d 701]; *Mulcahy* v. *Baldwin,* 216 Cal. 517, 525 [15 P.2d 738]; *Copeland* v. *Raub,* 36 Cal.App.2d 441, 447 [97 P.2d 859]; *Hershey* v. *Cole,* 130 Cal.App. 683, 701 [20 P.2d 972].)

The retroactive application of the 1949 amendment would impair the obligations of the landowner-bondowner contract in still another manner. By sections 3480 and 3480a of the Political Code, the lien of the assessment is made security

for the payment of the bonds.[10] Through the trustee of the bond fund, the bondholders may enforce their right to payment by a sale of land upon which a call has become delinquent. Prior to the amendment, the proceeds from such sales, or from the resale or rentals of delinquent lands, were required to be immediately applied to bond payments. Section 3480 of the Political Code[11] provides that they may be used for no other purpose. By directing the county treasurer to exclude such funds from his estimate, the amendment forces him to keep them intact. The bondholders are thus given a fund which must be held in reserve for their benefit in addition to the security of the assessment, thereby increasing their security.

The treasurer, however, argues that the landowners have no rights in the excluded funds, because the money was not paid to him pursuant to the statutory provisions which were a part of the 1930 contract. He correctly points out that the 1949 amendment excludes from credit in the computation of calls any amount in the treasury "deposited therein pursuant to Section 3466a of this code or derived from the sale of lands by the county treasurer as trustee of the district under the provisions of this section or Sections 3466a and 3480a of this code. . . ." Specifically, says the treasurer, the only money excluded by the challenged computation is either the purchase price of delinquent land or crop rental derived by virtue of section 3466a, which was not enacted until 1931, a year after the bonds were issued.[12]

This argument was conclusively answered by the decision in *River Farms Co.* v. *Gibson,* 4 Cal.App.2d 731 [42 P.2d 95]. In speaking of section 3466a, it was there said: "That the lands purchased by the county treasurer and deeded to himself as trustee either of the bond fund or for the benefit of the district, constitute a trust for the benefit of the bondholders, seems to us explicitly stated in the terms used in section 3480, *supra,* as it originally read and as it now stands amended. All moneys collected by the treasurer, whether on account of installment, penalties, interest or sale of lands, must be by him paid into the treasury for the benefit of the bondholders." (P. 744.) In essence, the court held that sec-

---

[10]See Wat. Code, § 51257.

[11]*Cf.* Wat. Code, §§ 51238, 51643.

[12]Stats. 1931, ch. 317, p. 773; now Wat. Code, §§ 51680-51695, 51750-51757.

tion 3480 created a trust fund for the benefit of bondholders which consists of money received on installment calls, from the sale of land on account of delinquencies, or from the resale of land purchased by the treasurer, and also all unsold land bought by him to satisfy delinquencies.

Concerning the money derived from the lease or operation of unsold lands of the district, it was said: ''That the rents, issues and profits derived from trust properties follow the *corpus* and become a part of the trust funds is unquestioned, irrespective of the act of the legislature adding section 3466(a), *supra*, providing for the management of property, the title to which has become vested in the county treasurer for the benefit of the district, and the specifying therein of the application to be made of rents, issues and profits.'' (P. 755.)

The treasurer argues that there is no increased burden upon the landowner, because the amendment merely provides a method of discharging the obligation of the assessment. His position is that the assessment is a fixed liability.

■ The nature of the burden which the levy of an assessment places upon the landowner must be measured by the terms of the statute creating the assessment. (*Ryan* v. *Byram*, 4 Cal.2d 596, 606 [51 P.2d 872] ; *Flinn* v. *Zerbe*, 40 Cal.App. 294, 296 [180 P. 650] ; *Abrams* v. *San Francisco*, 48 Cal.App. 2d 1, 6 [119 P.2d 197].) In 1919, when Assessment No. 1 was levied, it was expressly made a lien upon the land against which it was levied. (Pol. Code, § 3463.)[13] Such assessment was to be paid ''in separate installments, of such amounts, and at such times, respectively, as the [board of trustees], from time to time, in its discretion by order entered in its minutes may direct.'' (Pol. Code, § 3466.)[14] When bonds were issued, the assessment became security for their payment. (Pol. Code, §§ 3480, 3480a.)[15] Thereafter, the obligation of the property owner was measured by the statutory provisions applicable to payment. ''His obligations cannot be increased or lessened. The portion of the assessment, or rather, the amount of the installment that is to be paid by the land owner at each annual period is fixed when the contract is completed, by the sale of the bonds.'' (*Hershey* v. *Cole*, 130 Cal.App. 683, 689-700 [20 P.2d 972].)

The treasurer contends that if the ''credit provisions'' of section 3480, as it read when the bonds were issued, are

[13]Now Wat. Code, § 51256.
[14]Now Wat. Code, § 51517.
[15]Now Wat. Code, § 51257.

"held to require the purchase price and rentals of the delinquent lands in the bond fund to be credited against the bond calls as contended for by petitioner then, under the facts of this case, and the law as so construed and applied there would be clear violation of numerous provisions of both the federal and state constitutions." This argument is based upon the assumption that if all of the money in the bond fund is used to discharge the outstanding bonds, Sutter Basin Corporation and other landowners may never have to pay the assessment outstanding against their lands.

Bearing upon this issue is the paragraph entitled "Additional assessment," found in section 3480 of the Political Code.[16] It reads: "The lien of any unpaid assessment upon which bonds shall have been issued shall continue until all said bonds, and any refunding bonds which may be issued, shall have been paid in full except as hereinafter provided in reference to the use of bonds as payment of assessments . . ." The section also authorizes supplemental assessments in the event any of the bonds remain unpaid after the enforcement of the assessment.

These provisions do not necessarily imply that the assessment will be extinguished as the bonds are retired but make certain that it will continue until all outstanding bonds are paid. However, section 3456[17] requires all money derived from calls on the assessment to be set "apart as a separate fund for the purpose of paying the principal and interest of such bonds," and that no part of such money shall be used for any other purpose. There is no provision for making a call upon the assessment after all bonds have been retired; the only statutory authority for a call is to "pay interest and principal maturing on such interest date." (Pol. Code, § 3480.)[18] In *Bekins* v. *Raub*, 40 Cal.App.2d 709 [105 P.2d 625], it was held that, after bonds are issued, there is no right to call the assessment except to meet unpaid installments of principal and interest. Under no statute is the assessment lien extinguished by discharge of the outstanding bonds, neither is there any provision by which a landowner may be compelled to pay the assessment. However, section 3480 of the Political Code[19] reads: "Any landowner

[16]Now Wat. Code, §§ 51300-51302.
[17]Now Wat. Code, § 51238.
[18]Now Wat. Code, § 51420, *supra.*
[19]Wat. Code, § 51651.

of the district who shall desire at any time to lessen or remove the lien upon his land of any assessment on which bonds have been or hereafter may be issued may deliver to the county treasurer for cancellation any bonds payable out of said assessment, and the treasurer shall credit against the assessment on his land the principal and accrued interest.''

The purpose of the 1919 assessment was to provide for the cost of a specific improvement. The integral relationship between the assessment, the bonds issued to pay for that improvement, and the improvement itself was clearly recognized in *Rohwer* v. *Gibson,* 126 Cal.App. 707 [14 P.2d 1051]. In that case, the court denied a petition for a writ of mandate to compel the levy of an additional assessment for the purpose of paying delinquent installments upon outstanding bonds. It was held that the statutory provisions specifying the procedure for payment of the bonds were a limitation upon the taxing power of the district. ''When the collection of taxes has reached the value of the benefits conferred upon the lands within the district, there is then no legal provision for placing additional burdens. In other words, if under such conditions the bonded indebtedness has not all been paid, there exists no legal provision by means of which the holders thereof may receive payment.'' (Pp. 713-714.)

In the present situation, the taxing power will have been fully exercised when the improvement, to finance which the bonds were issued, has been paid for by the exaction of taxes in the form of calls for bond payments. This conclusion is strengthened by the language of those sections permitting the discharge of the lien of the assessment when outstanding bonds are surrendered. These sections clearly indicate a legislative intent to make the assessment co-extensive only with the collection of funds necessary to finance the improvement for which the assessment was levied. Presumably, the bond issue of Reclamation District No. 1500 was sufficient in amount to pay for the contemplated improvements for which the 1919 assessment was levied. Upon payment of the bonds, the assessment will have been fully discharged.

The contention of the treasurer that the application to bond payments of the money in controversy would be a gift of public funds to a private person, in violation of section 31 of article IV of the Constitution, is entirely without merit. Such money is not the property of the state or the district, but is a part of a trust fund held for the benefit of the bond-

holders. (*River Farms Co.* v. *Gibson, supra.*) Furthermore, payment of the legal obligation of the landowners to the bondholders is not a gift.

The county treasurer urges, however, that to permit a discharge of the unpaid assessments will discriminate against the landowners who have paid their assessments in full. Such result, it is argued, would cause them to bear the greater part of the cost of the improvement and deny to them equal protection of the laws, due process of law, grant to some landowners special privileges and immunities, and constitute special legislation.

Under the applicable statutes, a landowner was given two methods of discharging the lien of the assessment. He could acquire outstanding bonds of a face value equal to the amount of the assessment and, upon delivering them to the treasurer, have the lien discharged. If he preferred to do so, he could pay such calls as might be levied from time to time against his property. Such were the terms of the contract which the landowner accepted when the bonds were issued. Each property owner had the choice of taking the course which he deemed the more advisable. ▉ "The equality of the Constitution is the equality of right, and not of enjoyment. ▉ A law that confers equal rights on all citizens of the state, or subjects them to equal burdens, is an equal law. [Citations.] So long as the statute does not permit one to exercise the privilege while refusing it to another of like qualifications, under like conditions and circumstances, it is unobjectionable upon this ground." (*Watson* v. *Division of Motor Vehicles,* 212 Cal. 279, 284 [298 P. 481].)

▉ Even if there be no legal basis prohibiting the application of the excluded funds to payment of the bonds, argues the county treasurer, a writ of mandate must be denied to prevent an inequity.

That there is presently sufficient money to pay the outstanding bonds, without resort to calls on the assessment, is a fact which results from the economic conditions of the times. In the years immediately following the issuance of the refunding bonds there was economic depression. During that time, many landowners were unable to pay the calls of the treasurer and their lands were sold for delinquencies. Finding no bidders willing to pay the statutory upset price, the treasurer was obligated to buy the lands for the bond fund. By 1949, when the lands were sold, they had greatly increased in value. The amount here in controversy repre-

sents almost exclusively that increase in value. More accurately, that amount is an increment of the trust corpus from which the landowners' obligation to the bondholders was to be discharged. That all the landowners are not entitled to share in this fortuitous increase results from the course each selected to discharge the lien of his. assessment.

The depression conditions which influenced the prices of land and the ability of property owners to pay calls also were reflected in the value of outstanding bonds. It has been stipulated that many property owners were able to buy bonds at a substantial discount and apply them at face value against the lien of their assessments. Because the bonds of latest maturity could be purchased at the greatest discount, in the main, those surrendered were of that class. As a result there were fewer obligated landowners, thereby increasing the proportionate amount necessary to be paid by the remainder of them to meet the treasurer's calls to satisfy the currently maturing bonds. The treasurer's purchases of delinquent lands also increased the proportionate shares of the amounts necessary to meet bond payments. In addition, they were subjected to a 15 per cent charge over and above their shares to cover possible delinquencies. (Pol. Code, § 3480.)[20]

The course of action taken by each landowner was chosen with these facts clearly apparent. Those electing to discharge their liens by surrendering bonds purchased at a discount thought they were in a better position than the ones who decided to pay the calls as they were made. The landowners taking the second alternative relied upon the chance that the bond fund would be sufficient to meet all accruing amounts of principal and interest. That they have benefited by the exercise of business judgment which the law permitted is of no legal consequence in this proceeding. Theirs was the greater risk, and theirs was the greater gain.

The record does not support the treasurer's contention that Sutter Basin Corporation has waived the right to raise the constitutional question because its counsel appeared before committees of both houses of the Legislature and advocated the adoption of the amendment to section 3480 here in issue. The stipulation of facts shows that at no time did he advocate the exclusion from the treasurer's estimates of any money in the bond fund. He appeared in connection with proposed procedure in regard to the sale of delinquent lands.

---

[20]Now Wat. Code, § 51420.

These considerations compel the conclusion that a retroactive application of the 1949 amendment would impair the contract existing between the landowners and the bondholders.

Let a peremptory writ of mandate issue as prayed.

Shenk, J., Schauer, J., and Spence, J., concurred.

Gibson, C. J., dissented.

TRAYNOR, J.—I concur.

It is my opinion that the judgment herein follows necessarily from the premise established by the many California cases cited in the majority opinion that upon the issuance of bonds by a reclamation district a contract is created between the landowners of the district and the bondholders. Although persuasive arguments can be made against the soundness of this premise (see cases cited in 100 A.L.R. 164), it has become a rule of property governing the rights and duties of landowners and bondholders under past bond issues. It does not follow that the reasoning underlying the cases establishing the rule must be applied to future bond issues. (See concurring opinion in *Boyd* v. *Oser*, 23 Cal.2d 613, 623 [145 P.2d 312].) This court could provide a sound rule for the future by declaring that although those cases govern past bond issues, they are to be deemed overruled as applied to future bond issues. (*Great Northern Ry. Co.* v. *Sunburst Oil & Refining Co.*, 287 U.S. 358, 364 [53 S.Ct. 145, 77 L.Ed. 360, 85 A.L.R. 254]; *People* v. *Ryan*, 152 Cal. 364, 369 [92 P. 853]; *People* v. *Maughs*, 149 Cal. 253, 263 [86 P. 187].) A majority of this court, however, appears unwilling to reexamine the earlier cases at this time.

It bears noting that even though these cases are not overruled, the Legislature is free to provide that in future bond issues the relationship between landowner and district is that of sovereign and taxpayer and does not give the landowner contractual rights. The relationship between district and bondholder should of course remain contractual and the bondholder's rights free from impairment.

CARTER, J.—I dissent.

The premise on which the majority opinion is based is, that where bonds have been issued by a reclamation district which are secured by a special assessment levied upon the lands in the district according to the benefits received, there is a

contract between the bondholders and the landowners arising out of the law existing at the time the bonds are issued which cannot be changed, insofar as the landowner is concerned, by subsequent legislation; that such a change occurred here by reason of the amendment to Political Code, section 3480 (now Wat. Code, § 51420) enacted in 1949, which required the treasurer to exclude from the bond fund any monies therein which were obtained from the sale and rental of lands, acquired by the district as the result of sales for delinquent assessments, when he made his estimate of the amount of the annual installment required to meet the unpaid assessment. It is held that such exclusion impaired the contract between the bondholders and landowners in that it changes the time and method of payment of the assessment and gives the bondholders additional security because the landowner was entitled to have the land sale and rental money used to pay the bonds before he could be required to pay any installment of the assessment.

It is conceded, as it necessarily must be, that the Legislature has plenary power with regard to reclamation districts and that the Legislature may change the law with respect to them at will. ". . . [T]he Legislature shall have power to provide for the supervision, regulation and conduct, in such manner as it may determine, of the affairs of irrigation districts, reclamation districts or drainage districts, organized or existing under any law of this State." (Cal. Const., art. XI, § 13.) It necessarily follows that, as far as the landowners are concerned, there is no contract between the district and the landowners arising out of the statutes which existed when the bonds were issued, because, if it were otherwise the Legislature would not have the plenary power it does have over the affairs of reclamation districts. The majority opinion states, however, that there is such a contract between the landowners and the bondholders which cannot be impaired by a change in the law, which is merely an indirect way of saying there is a contract between the landowner and the district. Such a holding is contrary to the overwhelming weight of authority (100 A.L.R. 164), and the cases to the contrary in this state holding that there is such a contract between the bondholders and landowners should be overruled. In some of those cases it has been so stated when the issue was whether the *bondholders'* contract with the district had been impaired— whether *their* rights could be lessened by subsequent legislation, not whether the landowners' "rights" could be changed. (*Islais Co.* v.

*Matheson,* 3 Cal.2d 657 [45 P.2d 326] ; *Copeland* v. *Raub,* 36 Cal.App.2d 441 [97 P.2d 859] ; *River Farms Co.* v. *Gibson,* 4 Cal.App.2d 731 [42 P.2d 95].) The other cases (*County of Los Angeles* v. *Rockhold,* 3 Cal.2d 192 [44 P.2d 340, 100 A.L.R. 149] ; *County of San Diego* v. *Childs,* 217 Cal. 109 [17 P.2d 734] ; *Hershey* v. *Cole,* 130 Cal.App. 683 [20 P.2d 972]) that do hold that the *landowner* also has a contract right with the bondholder to the continuance of the existing law are clearly wrong. In the instant case the bondholders are not asserting that the money received from the rental and sale of delinquent lands must be considered in computing the annual assessment installment. The landowner is asserting that claim against the district and the legislative amendment to section 3680. He may not do so because of the plenary power of the Legislature over the taxes or assessments that the landowner may be required to pay.

While it is true that before the 1949 amendment to section 3680, the treasurer, in computing the annual assessment installment considered moneys already in the bond fund from any proper source as being available to pay the installment. That may be said to have been merely a method of arriving at the amount of the installment in which the landowner has no contract right because the basic assessment was made against his land in a lump sum and that is his fundamental liability.

Assuming there is a contract between the bondholders and landowners which the latter may insist cannot be impaired as against the district by any subsequent legislation, there has been no impairment here, and even if there has been to some extent, it may be justified under the police power.

The majority opinion states that the contract under section 3480 of the Political Code is that the bond fund was to consist of all assessments and amounts collected from the sale of delinquent lands, and such fund was to be used exclusively for the payment of bonds; that the treasurer shall annually estimate the amount of the installment on the assessment to be paid, and in making his computation, shall give consideration to the amount then in that fund from any proper source. It is the latter provision which was changed by the 1949 amendment to that section which provided that the amount in the fund from the sale of lands should be excluded in computing the annual assessment call. Such a change does not constitute an impairment of the contract. The basic contract on the part of the landowner was an agreement to pay

the *entire* assessment which was levied against his land, and it has always been payable in installments of such amounts and at such times as the board of directors of the district may direct. (Pol. Code, § 3466; Wat. Code, § 51517.) The computation provision was merely a method of arriving at the amount of an annual installment and did not purport to lessen the amount of the assessment payable. It did not give the landowners an absolute right to have the assessment installments computed in that way. It may have given them the right to insist that the money in the fund be used to pay bonds, but the time or method of the payment of the assessment was left to the discretion of the board of directors of the district and the Legislature. Indeed it may be that the method of computation of the installments was for the sole benefit of the bondholders rather than the landowners. It fixes a procedure which will assure the former of funds to pay their bonds and interest coupons as they fall due rather than a limitation on the amount of the installment that may be demanded.

It is also suggested that the bondholders are given greater security by the 1949 amendment than they had before, that is, an assessment call large enough in itself to pay principle and interest without crediting the amount already in the bond fund. The bondholders at all times had that security, because, by the terms of the bonds as set forth in the form of bond contained in section 3480, the bonds were "based upon and secured by the assessment levied on the lands."

The Legislature could have reasonably concluded that if there is some impairment of the contract it was justified under its police power. It could reasonably determine that there should be equity and fairness as between the landowners in the district and that it would be inequitable for the landowner here involved to obtain a windfall by reason of the money in the bond fund which was obtained from the sale of delinquent lands—that is, by excluding such money, he will not be excused from paying his assessment when the others have paid theirs. The Legislature may have reasonably decided that the most equitable method to meet the condition brought about by changing economic conditions was to require the assessments to be paid in full, leaving the district with surplus funds which will ultimately inure to the benefit of all landowners in the district, rather than giving one landowner a windfall. It is not a case of taking delinquent land sales money from the landowners to their detriment. Those funds still are held for the benefit of all of them. It is true that

other owners have paid their assessments with bonds at their face value, which they purchased at a price below that amount during the depression, and hence benefited, but whether that matches the windfall the instant landowner will receive or whether it is better for the district to have the funds for the benefit of all under the 1949 amendment, was properly a matter of legislative determination. It should be noted that the Legislature could also consider that any assessment installment now paid is with inflated money, but the amount of the bond has not increased since the depression because the amount payable on the bonds is fixed.

The essence of the majority opinion's position seems to be that the landowners are entitled to have the bond fund exhausted and that source alone must first be used to pay the bonds and hence the regular annual assessment cannot be collected. That is substantially the same as *County of San Diego* v. *Hammond,* 6 Cal.2d 709 [59 P.2d 478, 105 A.L.R. 1155], where legislation was passed after an assessment and bond issue which was payable solely out of assessments against the lands benefited, which authorized the county to pay the assessments out of a general tax levy. Some of the landowners, *who had paid all their assessments,* urged that it would impair their contract, under which the assessment was all they would have to pay; that by their being subject to the general tax to reduce assessments on landowners who had not paid their assessments, their contract that the bonds would be paid only by the assessments, was impaired. The court held it was not. To the same effect see *City of Dunsmuir* v. *Porter,* 7 Cal.2d 269 [60 P.2d 836]. Likewise, in the instant case, petitioner's contract has not been impaired because it was always liable for the assessment and cannot insist that the bonds be payable solely from funds derived from the sale and rental of delinquent lands. Petitioner is not being injured because, to give it what it claims, would be a windfall, not something to which it is entitled.

It is my view that the petition should be denied.

Respondents' petition for a rehearing was denied March 16, 1953. Gibson, C. J., and Carter, J., were of the opinion that the petition should be granted.